UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                    )
CHRISTOPHER MURPHY,                 )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )    C.A. No. 22-115 WES
                                    )
CITY OF PROVIDENCE, et al.,         )
                                    )
        Defendants.                 )
_____)

<u>**MEMORANDUM AND ORDER**</u>

WILLIAM E. SMITH, Senior District Judge.

    Before the Court are Defendants Tavares and Torres' Motion for Summary Judgment (the "Officers' Motion"), Dkt. No. 42, Plaintiff's Motion for Partial Summary Judgment and Objection to the Officers' Motion ("Plaintiff's Motion"), Dkt. No. 45, and Defendants' City of Providence, Hugh T. Clements, and Steven M. Paré's Motion for Partial Summary Judgment (the "City's Motion"), Dkt. 50. For the reasons below, the Officers' Motion is granted in part and denied in part, Plaintiff's Motion is denied in part, and the City's Motion is granted in part and denied in part. As to the remaining parts of Plaintiff's Motion, Plaintiff is entitled to summary judgment pending a jury's determination of a lingering factual dispute; as such, the Court's orders regarding these parts of Plaintiff's Motion will not ripen into final judgments until the factual dispute is resolved.

I.    **BACKGROUND**

The following facts are drawn from the Court's review of video evidence and the parties' statements of disputed and undisputed facts.  On October 20, 2020, Plaintiff Christopher Murphy attended a protest in Providence, Rhode Island, to honor Jhamal Gonsalves, who was injured in a motor vehicle crash involving the Providence Police Department two days earlier.    Defs. Tavares & Torres Statement Undisputed Facts ("Officers' SUF") ¶¶ 2-3, Dkt. No. 43. After the event ended around 7:30 PM, Murphy and other protestors marched to Providence Police headquarters, which is on Dean Street, north of Washington Street.  Id. ¶¶ 4-5, 21-22.  The crowd stopped in front of a temporary fence blocking Dean Street, just south of police headquarters, and behind which there were about two dozen officers in riot gear.  Id. ¶ 6; see Officers' Mot. Ex. A, Dkt. No. 42-2.

Another speaking program took place in front of the fence and ended around 8:30 PM, after which about ten more officers arrived. Id. ¶¶ 7-8; Pl.'s Statement Additional Undisputed Facts Supp. Pl.'s Mot. ("Pl.'s SUF") Ex. C ("Full Video"), at 2:22:40-23:45, Dkt. No. 46-4.  For the next forty minutes, the officers stood a few yards behind the fence.  See Full Video, at 2:24:00-3:03:00. Although the crowd thinned out, several dozen protestors stayed up near the fence during this period, including Murphy, who was

2

wearing a bright orange hoodie. Id. at 2:38:00-42:00. More officers lined up behind the fence, and some protestors began to throw objects — mostly what appear to be plastic bottles — over the fence and at the police. See id.

About thirty minutes after the speaking program concluded, someone set off a firework on the protestors' side of the fence. Id. at 2:52:00-53:00. By then, only a handful of protestors, including Murphy, were standing near the fence. Id. at 2:53:20-50. But after the explosion, several officers moved up closer to the fence, and some protestors returned. Id. at 2:54:00-3:03:00. More officers soon arrived, and about a dozen officers in riot gear formed a line on the protestors' side of the fence. Id. at 3:03:00-45. Officers warned the protestors to move back or face arrest; although the other protestors moved, Murphy stayed put — feet planted, hands in pockets, looking straight ahead — about an arm's length from the officers in front of him. Id. at 3:03:45-04:00. One officer appeared to address Murphy when he shouted, "If he doesn't move, he is going to be arrested. You need to move, or you will be arrested," while a second officer said, "Time to go, or you're gonna go to jail." Id. at 3:04:00-10. A fellow protestor then walked up to Murphy, put his arm around him, and led him back to the retreating group of protestors. Id. at 3:04:10-20. As this happened, the officers began to advance in

3

unison, shouting "Move, back! Move, back!"  Id. at 3:04:20-40.
Murphy kept a few steps ahead of the officers as they advanced
south toward Washington Street; meanwhile, the situation grew more
chaotic.  See id. at 3:04:40-07:00.  Additional fireworks went
off, including some that were lobbed in the officers' direction
before exploding on the pavement, and a section of fence was tossed
into the officers' path, hitting at least one officer.  See id.
Eventually, the officers moved the protestors all the way back to
Westminster Street, a block south of Washington Street, where there
is a busy four-way intersection.  Id. at 3:07:00-09:00.

    Minutes after advancing to Westminster Street, the officers
retreated about a hundred feet up Dean Street.  Id. at 3:11:00-
30.  Several protestors followed them a short way up the street;
Murphy, however, walked up to within fifteen feet of the officers
before he stopped, adopted a rigid stance, and again looked
straight ahead.  Id. at 3:11:30-40.  The officers then pressed
back down to the bottom of Dean Street and re-formed the line;
while Murphy, who had again kept a few steps ahead of the advancing
officers, walked into the intersection, stopped in the crosswalk
on Westminster Street, southwest of Dean Street, and turned around
to face the officers from a distance.  Id. at 3:11:45-12:05.

    Murphy stood there alone in the middle of the crosswalk, while
motorists navigated the intersection and other protestors milled

4

about the area.  Id. at 3:12:05-19:05.  After around seven minutes, the officers entered the intersection, maintaining line formation as they turned ninety degrees from their position on Dean Street to the crosswalk on Westminster Street.  Id. at 3:19:05-45.  As before, Murphy kept a few steps ahead of the officers and stopped about fifteen feet to the west of the crosswalk in the middle of the street, his back turned to the police line.  Id.  A few seconds passed — during which the officers made no audible commands to the protestors — before they advanced once again.  Id. at 3:19:45-50.

Murphy looked back, saw the police line approaching, and began to walk away.  Id. at 3:19:48-52.  He did not make it far.  One officer, Defendant Flavio Tavares, charged about ten feet ahead of the other officers and, while holding a baton in his left hand, lunged at Murphy with arms extended.  Id. at 3:19:52-55; see also Officers' Mot. Ex. Q ("Arrest Video"), Dkt. No. 42-2.  Tavares's left hand came down on Murphy's left shoulder, and if the baton did not hit Murphy in the back of the head, then it barely missed.  Arrest Video, at 00:12-16.  Murphy's head rocked forward and, as Tavares wrestled him to the ground, Murphy covered the back of his head with both hands.  Id. at 00:16-24.  After taking Murphy down, Tavares returned to the police line.  Id. at 00:24-01:00; see also Officers' SUF ¶ 32.

Several officers were positioned behind the police line to

5

make arrests, including Defendant Irvin Torres.  Officers' SUF ¶ 32.  Torres first approached Murphy — who was lying prone on the ground, one or both hands covering his head — from his left side, but then he stepped over Murphy's body, crouched beside him, and kneed Murphy twice in the back before putting him in handcuffs.[1] Arrest Video, at 00:38-50; see Defs.' Tavares & Torres Statement Disputed Facts Regarding Pl.'s Mot. ("Officers' SDF") ¶ 36, Dkt. No. 49.  For a sense of timing, less than a second after Torres stepped over Murphy's body, a car horn blared, and Torres dealt the first knee strike less than a second after that.  Full Video, at 3:20:00-04.  Another video captures the arrest from a different angle.  Officers' Mot. Ex. N ("2d Arrest Video"), Dkt. No. 42-2. Although Torres cannot be seen delivering the knee strikes from this angle, one can hear him shout "Give me your hands!" — presumably to Murphy — but only after the car horn has begun to blare, and by the time he issues the entire command, the horn has been blaring for more than a second.  Id. at 00:30-34.  If one uses the car horn for reference, that means less than a second

---

[1] The video footage appears to show that, before stepping over Murphy's body and striking him in the back with his knee, Torres lifted the bottom of Murphy's hoodie to expose his back.  See Pl.'s Statement Additional Undisputed Facts Supp. Pl.'s Mot. ("Pl.'s SUF") Ex. C ("Full Video"), at 3:19:56-20:01.  The parties do not address this in their filings, nor was Torres asked about this during his deposition.

passed between Torres issuing the command and delivering the first knee strike; indeed, one could reasonably perceive these actions to have occurred simultaneously, or even that Torres delivered the knee strike before issuing the command.  Torres returned to the police line after placing Murphy in handcuffs and Murphy was taken into custody as other officers directed traffic.  Id. at 00:50-01:20; Full Video, at 3:20:00-21:00.

The morning after the protest, Murphy was arraigned in state court on charges of disorderly conduct and resisting arrest; he was later found guilty of disorderly conduct for obstruction of a roadway, and the resisting arrest charge was dismissed.  Officers' SUF ¶¶ 33-34; see R.I. Gen. Laws § 11-45-1(a)(4).

In March 2022, Murphy filed a nine-count Complaint against Tavares and Torres, individually and in their official capacities as police officers in the Providence Police Department; the City of Providence ("the City"); Hugh T. Clements, Jr., individually and in his official capacity as Chief of the Providence Police Department; and Steven M. Paré, individually and in his official capacity as Commissioner of Public Safety for the City.  Compl. ¶¶ 3-6, Dkt. No. 1.  Murphy filed an Amended Complaint in August 2023.  See generally Am. Compl., Dkt. No. 32.

In Counts One, Three, and Five, Murphy brings claims under 42 U.S.C. § 1983 for excessive force in violation of the Fourth

Amendment, as incorporated against the states through the Fourteenth Amendment; impairment of freedom of speech and assembly in violation of the First Amendment, as incorporated; and malicious prosecution in violation of the Fourth and Fifth Amendments, as incorporated.  Am. Compl. ¶¶ 111, 113, 115.  Counts Two, Four, and Six feature analogue claims under the Rhode Island Constitution. Id. ¶¶ 112, 114, 116.  And in Counts Seven, Eight, and Nine, Murphy brings common-law claims for assault, battery, and false arrest. Id. ¶¶ 117-119.

Tavares and Torres move for summary judgment on all claims. Officers' Mot. 26.  Murphy, in contrast, moves for partial summary judgment as to liability against Tavares and Torres for excessive force under 42 U.S.C. § 1983, assault, and battery; while conceding the dismissal of all other claims except for his excessive force claim under the state constitution.  Pl.'s Combined Mem. L. Supp. Mot. Partial Summ. J. & Obj. Officers' Mot. ("Pl.'s Mem.") 25-26, Dkt. No. 45-1.  Finally, the City, Clements, and Paré move for (1) partial summary judgment on Murphy's § 1983 and common-law claims as against the City, but only insofar as they are premised on a failure-to-discipline theory of liability; (2) summary judgment on all claims as against Clements and Paré; and (3) summary judgment on Murphy's state-constitutional claims as against the City. Defs.' City, Clements & Paré's Mem. Supp. Mot. Summ. J. ("City's

Mem.") 1, Dkt. No. 50-1.

## II.  LEGAL STANDARD

"A grant of summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  Viscito v. Nat'l Plan. Corp., 34 F.4th 78, 83 (1st Cir. 2022) (quoting Garcia-Garcia v. Costco Wholesale Corp., 878 F.3d 411, 417 (1st Cir. 2017)).  "On cross-motions for summary judgment, each motion is reviewed separately, drawing facts and inferences in favor of the non-moving party."  Scottsdale Ins. v. United Rentals (N. Am.), Inc., 977 F.3d 69, 72 (1st Cir. 2020).

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Id. (internal quotation marks omitted) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Id.

## III. DISCUSSION

### A. Conceded Claims

Murphy concedes to the dismissal of Counts Three, Four, Five, Six, and Nine. Pl.'s Mem. 1. The Court therefore grants summary judgment to Defendants on these counts.

### B. Section 1983 Excessive Force

The Amended Complaint does not specify the various claims and theories of liability encompassed in Count One, which alleges that Defendants violated Murphy's Fourth Amendment right to be free from excessive force. Am. Compl. ¶ 111. But Murphy's more recent filings provide some insight. First, Murphy argues that Tavares and Torres are both individually liable under § 1983 for excessive force: Tavares for using a takedown maneuver to arrest Murphy and striking Murphy in the head with a baton; and Torres for striking Murphy twice in the ribs with his knee while Murphy was on the ground with his hands on his head. Pl.'s Mem. 9, 14, 19. Second, Murphy argues that the City is municipally liable under § 1983 because it "maintains a de facto policy of subjecting arrestees to excessive use of force, which resulted in the unreasonable and gratuitous knee strikes Defendant Torres used against [him]." Pl.'s Resp. Opp'n City's Mot. 2, Dkt. No. 54. Finally, Murphy argues that Clements is liable in a supervisory capacity under § 1983 because he knew or should have known of the City's de facto

policy.  Id.

Although Murphy sued Tavares in his official capacity, he no longer contends that the City or Clements is liable under § 1983 for the allegations of excessive force against Tavares; and Murphy concedes that Paré is not liable on any counts.  See id.  The Court's review of the § 1983 claims against the City and Clements is thus concerned only with the allegations against Torres, and it grants summary judgment to Paré on all counts.

**1. Individual Liability (Officers Tavares and Torres)**

The Court finds that Tavares violated Murphy's constitutional rights when he lunged at Murphy from behind with arms outstretched and a baton in his hand.  The Court also finds that Tavares is not entitled to qualified immunity.  But the Court reserves judgment on Murphy's § 1938 excessive force claim against Tavares because, although it appears to the Court that Tavares's baton struck Murphy in the head, a reasonable jury could believe otherwise.  Both this issue and that of damages must go to a jury.

As for Murphy's § 1983 excessive force claim against Torres, the Court grants Torres summary judgment.  The Court finds that Torres violated Murphy's constitutional rights when, without giving Murphy a chance to submit peacefully to arrest, he used his knee to strike Murphy twice in the back while Murphy was face down in the street with one or both hands on his head.  Although this

was an unreasonable and thus excessive use of force, the Court finds that a reasonable officer may not have understood that the knee strikes were unlawful under the circumstances, and so Torres is entitled to qualified immunity.

"To establish an excessive force claim under the Fourth Amendment, 'a plaintiff must show that the defendant officer employed force that was unreasonable under the circumstances.'" Heredia v. Roscoe, 125 F.4th 34, 44 (1st Cir. 2025) (quoting Jennings v. Jones, 499 F.3d 2, 11 (1st Cir. 2007)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene," and the analysis must account "for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 396-97 (1989).

"Because '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,' . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade

12

arrest by flight." Id. at 396 (alteration in original) (quoting Bell v. Wolfish, 441 U.S. 520, 559 (1979)).

Even if a defendant police officer is found to have violated a plaintiff's Fourth Amendment rights, the officer may be shielded from liability under the doctrine of qualified immunity. Mullenix v. Luna, 577 U.S. 7, 11 (2015). "[T]o determine whether qualified immunity applies in a given case," a court must assess not only "whether a public official has violated a plaintiff's constitutional right," but also whether the right "was clearly established at the time of the violation." Heredia, 125 F.4th at 46 (quoting Raiche v. Pietroski, 523 F.3d 30, 35 (1st Cir. 2010)).

### a. Officer Tavares

The Court does not decide at this juncture whether Tavares's baton struck Murphy in the back of the head. That is an issue for a jury to decide, along with the issue of damages. But regardless of whether the baton made contact, the Court finds that as a matter of law, Tavares violated Murphy's constitutional rights, and that he is not entitled to qualified immunity.

### i. Constitutional Violation

Viewed in the light most favoring Tavares, Murphy's behavior prior to his arrest was odd, if not provocative; and the officers undoubtedly faced a tense, dynamic, and at times chaotic situation following the protest. But Tavares's takedown of Murphy was

13

nevertheless unreasonable.

Applying the Graham factors, first, the severity of the crime at issue was minor: Murphy was found guilty of disorderly conduct for obstruction of a roadway, a misdemeanor.  See Graham, 490 U.S. at 396; Officers' SUF ¶ 34; R.I. Gen. Laws. § 11-45-1(a)(4). Second, Murphy did not pose an immediate threat to the safety of the officers or others.  See Graham, 490 U.S. at 396.  When Tavares initiated the takedown, Murphy was walking away from the officers, which he had done each time the police line advanced.  Tavares argues that "Murphy displayed threatening and bizarre behavior, to say the least," and cites specifically his decision to follow the officers when they momentarily retreated up Dean Street.  Defs. Tavares & Torres' Obj. & Reply Pl.'s Mot. ("Officers' Obj.") 5, Dkt. No. 48.  But even when Murphy did this, he kept a safe distance from the officers and walked away as soon as they marched down the street again.  In the Court's view, Murphy's behavior was strange and, at worst, marked by a certain bravado, if not a contempt of law enforcement.  But he did not pose an immediate threat.  Contra Estate of Rahim v. Doe, 51 F.4th 402, 406 (1st Cir. 2022) (finding suspect who "advance[ed] on the officers" with a knife posed an immediate threat); Conlogue v. Hamilton, 906 F.3d 150, 156 (1st Cir. 2018); (refusing to drop firearm and pointing it at officers); McGrath v. Tavares, 757 F.3d 20, 28 (1st Cir. 2014) (driving car

at officers).  Furthermore, Tavares testified that Murphy neither threatened the officers nor acted in a threatening manner toward the officers; and that he, Tavares, did not feel threatened by Murphy.  See Pl.'s Mot. Ex. A ("Tavares Dep."), at 162:3-14, 187:6-9, Dkt. No. 46-2.

Third, Murphy was not actively resisting arrest or attempting to evade arrest by flight when Tavares took him down.  See Graham, 490 U.S. at 396.  Tavares faults Murphy for "mov[ing] away from the police [whenever] they approached him," which "call[ed] for a tactical decision to arrest him when the opportunity arose and to do so surreptitiously and quickly."  Officers' Obj. 5.  But Murphy was never told he was under arrest, Pl.'s SUF ¶¶ 9-10, which undermines Tavares's apparent contention that it was necessary to catch Murphy by surprise in order to arrest him.  All Murphy was told was that it was "[t]ime to go" — this command was given only once, before the police first began to march down Dean Street — and on several occasions to "move" or "move back," which he did each time the police line advanced.  Full Video, at 3:04:00-10; see, e.g., id. at 3:04:20-40.  Indeed, during his deposition, when asked "[i]f someone is standing in front [of] you walking away from the line as you're saying move back, you would consider that to be complying," Tavares answered, "Yes."  Tavares Dep. 151:15-19.  In effect, Tavares argues that it was necessary to use force

15

against Murphy because he complied with police orders.

Relatedly, on the issue of Murphy's compliance with orders to "move" or "move back," Tavares asserts that "[t]he intent of those orders was for the crowd to disperse and leave the area." Officers' SDF ¶ 4. But see Officers' Mot. Ex. H ("Fence Video"), at 00:26-44, Dkt. No. 42-2 (recording police-radio communications in which speaker does not mention dispersal and says plan is to "start moving people on Dean Street towards Westminster"). If that were indeed the intent, then the officers should have made those intentions known, rather than merely ordering the crowd to "move back." To be sure, Murphy's behavior — standing by himself in the street, facing down the officers from a distance, and walking up to within fifteen feet of the police line — struck a defiant tone. But he nevertheless complied with all police orders and was otherwise cooperative.

In sum, all three Graham factors counsel against the use of force in this case, and that is before one considers the amount of force that Tavares used.

As already noted, Graham reminds courts that "officers are often forced to make split-second judgments" in "tense, uncertain, and rapidly evolving" situations. 490 U.S. at 396-97. But this situation was different: It was the Providence Police Department that decided to push a restive crowd into a busy intersection; and

the decision to arrest Murphy was not based on a split-second judgment. Tavares testified that just after the police line re-formed at the bottom of Dean Street, a riot commander told the officers to grab Murphy if the opportunity arose. See Tavares Dep. 151:20-152:12, 153:6-9. In the several minutes that passed between receiving this command and executing the takedown, Tavares had time to consider the amount of force that he would use to make the arrest.

Turning to the amount of force at issue, it is clear from the video that Tavares broke from the police line and lunged at Murphy — who was walking away from the police line with his back to the officers — while holding a baton in his left hand with his arms outstretched. What happened next, however, is disputed: Murphy asserts that the video clearly shows that the baton struck him in the back of the head, while Tavares contends that the same video shows there was no contact. Compare Pl.'s Mot. 15, with Officers' SDF ¶ 22. On this issue, both parties cite Scott v. Harris, 550 U.S. 372 (2007), which concerned the proper use of video evidence at the summary judgment stage. See Officers' Mot. 21 & n.3; Pl.'s Mot. 16. In Scott, there was a videotape in evidence that, in the majority's view, "blatantly contradicted" the nonmovant's version of the facts. 550 U.S. at 380. Because this "version of events [was] so utterly discredited by the record that no reasonable jury

could have believed" the nonmovant, the Supreme Court held that the lower court "should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape." Id. at 380-81.

The Court finds Scott instructive but not dispositive.  In the Court's view, the video suggests that the baton struck Murphy in the back of the head: it is difficult to make out, but the baton appears to make contact; then, Murphy's head rocks forward, and as he falls to the ground, he reaches for the back of his head with both hands instead of bracing himself.  He also later went to the hospital, where he was diagnosed with a possible concussion.  Pl.'s SUF Ex. K, at 8, Dkt. No. 46-12.  But see Officers' SDF ¶¶ 45-47. But despite the Court's view that Murphy was hit, it is possible that a reasonable jury could reach the opposite conclusion.  Both versions of the video (in real-time and slow motion) are blurry; the video was shot at night; and it was taken from a distance. See Full Video, at 3:19:52-59; Arrest Video, at 00:06-20.  Thus, the Court finds that the question of whether Murphy was actually struck in the head is better left to a jury.

But there is one question the Court can answer.  If the baton did not hit the back of Murphy's head, then it barely missed.  The question, then, is whether it was reasonable for Tavares to execute a takedown in the way that he did, exposing Murphy to a substantial

18

risk of serious bodily injury.  The Court finds that it was not.

As Tavares himself testified, Murphy was complying with orders to "move back" when the officers proceeded down Westminster Street.  See Tavares Dep. 151:15-19.  Tavares nevertheless charged ahead of his fellow officers and, with both arms outstretched and a baton in his left hand, lunged at Murphy from behind.  Tavares's left hand came down on Murphy's left shoulder, and the baton swung very close to, and arguably struck, the back of Murphy's head.  Murphy then fell to the ground.  He was never told he was under arrest, nor was he "given a chance to submit peacefully to arrest before significant force was used to subdue him."  Ciolino v. Gikas, 861 F.3d 296, 304 (1st Cir. 2017).  No doubt Tavares found himself in a tense situation, and he was under orders to "grab[]" Murphy if given the opportunity.  Tavares Dep. 151:23-25.  He also testified that bringing Murphy to the ground was necessary, in his view, to protect him from objects thrown at police.  Id. at 161:3-10.  But none of these considerations, even in combination, make the takedown a reasonable use of force.[2]  See Stamps v. Town of Framingham, 813 F.3d 27, 35 & n.8 (1st Cir. 2016) (suggesting that

---

[2] On the issue of intent, Tavares may not have intended to hit Murphy in the head with his baton, but he nevertheless intended to lunge at Murphy's shoulders while holding the baton.  In other words, there was an "intentional acquisition of physical control."  Brower v. County of Inyo, 489 U.S. 593, 596 (1989).

"risky behavior" is "susceptible to Fourth Amendment scrutiny" regardless of whether "the foreseeable harm of that behavior comes to pass").

Notably, Tavares does not dispute that it is a matter of "[s]tandard police training . . . that strikes to the head with a baton can cause death and serious bodily injury and are considered to be uses of deadly force"; indeed, he testified as much.  Compare Pl.'s SUF ¶¶ 19-21, with Officers' SDF ¶¶ 16-22.  It is possible that, had Tavares used only minimal or moderate force to make the arrest, he would have a stronger defense to Murphy's § 1983 claim. For example, instead of lunging at Murphy with both arms extended, Tavares could have walked up to Murphy, grabbed him by the shoulder with his free hand, and told him he was under arrest; or he could have used his baton to "rake" Murphy behind the police line.  See Pl.'s Mot. 18-19.  But that is not what happened.  Because the Court finds that it was objectively unreasonable for Tavares to lunge for Murphy's shoulders while holding a baton in his hand, it concludes that he violated Murphy's Fourth Amendment rights.

### ii. Qualified Immunity

Tavares is not entitled to qualified immunity because he violated a clearly established right.  For the purposes of § 1983, a police officer's conduct violates a clearly established right "either if courts have previously ruled that materially similar

conduct was unconstitutional, or if the conduct was such an obvious violation of the Fourth Amendment's general prohibition on unreasonable force that a reasonable officer would not have required prior case law on point to be on notice that his conduct was unlawful." Heredia, 125 F.4th at 47 (quoting Raiche, 623 F.3d at 38).

The First Circuit has issued several decisions that, if not perfectly on point, nevertheless put Tavares on notice that his conduct was unlawful. See id., 125 F.4th at 47-48 (summarizing these decisions); see also Hope v. Pelzer, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). In 2007, the First Circuit held that even when confronted with a "chao[tic]" situation that "may have made it difficult . . . to gauge the appropriate level of force," an objectively reasonable officer "would not have believed that it was lawful to increase the amount of force" on a suspect after he had "ceased resisting and stated that [the officer] was hurting him." Jennings, 499 F.3d at 19. In 2010, it held that "a reasonable officer with training on the use of force continuum would not have needed prior case law on point to recognize that it is unconstitutional to tackle a person who has already stopped in response to the officer's command to stop and who presents no indications of dangerousness." Raiche,

21

623 F.3d at 39 (citation modified).  And in 2017, it held that a reasonable officer would have understood that it was unlawful to throw a suspect to the ground without first giving him "a chance to submit peacefully to arrest," even if he was a perceived instigator of a crowd that had been ordered to disperse.  Ciolino, 861 F.3d at 299, 304, 306.

The decisions above stand for a general rule against the use of takedowns when the suspect has not been given a chance to submit to arrest and is complying with police orders, even if the circumstances permit some level of force or involve crowd-control scenarios.  See United States v. Lanier, 520 U.S. 259, 271 (1997) ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful.") (citation modified).  To be sure, in none of these cases did police confront unruly crowds on open streets while fireworks and other objects sailed overhead.  But even if a reasonable officer would have believed that it was lawful to execute a takedown under the circumstances at issue here, the officer would have known that it was unlawful to lunge for Murphy's shoulders while holding a baton, lest the officer risk a serious blow to Murphy's head.  Accordingly, the Court finds that Tavares is not entitled to qualified immunity on Murphy's § 1983

excessive force claim.

Although liability has been established, the Court reserves judgment on Murphy's § 1983 excessive force claim against Tavares because a jury must first determine the factual question of whether Tavares's baton struck Murphy's head.  At trial, the jury's determination will be limited to this issue and to damages.  Final judgment will enter once the jury makes its determination.

### b. Officer Torres

Torres violated Murphy's Fourth Amendment rights because the knee strikes that he delivered to Murphy's back were unreasonable under the circumstances.  The Court finds that Torres is entitled to qualified immunity, however, because the contours of the right that he violated were not clearly established at the time.

### i. Constitutional Violation

After falling to the ground, Murphy lay prone in the street with one or both hands on the back of his head.  Full Video, at 3:19:56-59; see also Pl.'s Mot. Ex. B ("Torres Dep."), at 107:7-13.  In the span of about six seconds, Torres approached Murphy, lifted his sweatshirt to expose his torso, stepped over his body, and kneed him twice in the back.  Full Video, at 3:19:56-20:02.  According to Torres, he delivered the knee strikes because Murphy was resisting arrest — his arms were tensed — and Torres also issued a command to "give me your hands."  Torres Dep. 106:2-

23

108:2, 129:12-132:25; Officers' Mot. 10.  Based on the Court's review of video evidence, Torres issued the command and delivered the first knee strike within a second of each other, and which came first is unclear.

None of the Graham factors suggest that the knee strikes were reasonable.  Furthermore, although the surrounding circumstances were "tense, uncertain, and rapidly evolving," the knee strikes were excessive.  See Graham, 490 U.S. at 396-97.  The severity of the crime at issue was minor, and Murphy did not pose an immediate threat to law enforcement or to other people.  He was lying face-down with one or both hands on his head while surrounded by multiple police officers.  And because Torres lifted the bottom of Murphy's sweatshirt before stepping over his body, he had confirmed that Murphy was unarmed before delivering the knee strikes.

Torres justifies the knee strikes by claiming that Murphy was actively resisting arrest.  "[T]ensing" is an example of "active resistance" according to the Providence Police Department's use-of-force policy.  See Torres Dep. Ex. 2, at 4.  Although Torres felt that Murphy's arms were tensed, he did not tell Murphy that he was under arrest, nor did Torres give Murphy a chance to comply before delivering the knee strikes.  See id. at 107:18-108:2, 113:25-114:5. As for why Torres delivered two knee strikes instead of one, he did not have an answer, and he conceded that he did not

give Murphy time to comply after the first knee strike before delivering the second. Id. at 110:12-112:4. Essentially, the command, first knee strike, and second knee strike occurred simultaneously. Indeed, one can reasonably interpret Torres's deposition testimony to mean that he issued the command, and thus initiated the strikes, before he felt that Murphy's arms were tensed. See id. at 107:18-25 ("I possibly said, give me your hands, and I felt a tensed arm."). But whatever the exact sequence of events: (1) no more than one or two seconds passed between the moment Torres felt that Murphy's arms were tensed and the moment Torres delivered the knee strikes; (2) Murphy was not told he was under arrest; and (3) Torres gave Murphy no time to comply with his command. Under these circumstances, and notwithstanding the terms of the use-of-force policy, the Court finds that Murphy was not actively resisting arrest when Torres delivered the knee strikes. See Velez v. Eutzy, 152 F.4th 292, 297-98, 301 (1st Cir. 2025) (describing resistance as "passive and its resoluteness . . . untested by a conversation or the passing of even a few moments" where plaintiff disobeyed command to get out of car and "brace[d] himself against the car frame as the officers . . . pulled on him"); see also Shumate v. City of Adrian, 44 F.4th 427, 449 (6th Cir. 2022) ("The suggestion that [plaintiff's] behavior amounted to an act of defiance is diminished for another reason:

he was not told that he was under arrest . . . .").

Torres no doubt confronted a challenging situation.  He was on an open street, he had other arrests to make, and he had to worry about fireworks and other objects flying overhead.  See Torres Dep. 108:11-14, 110:1-5, 114:8-15.  But Torres was surrounded by multiple officers, some of whom were directing traffic, and he resorted to the use of force almost immediately, in effect giving Murphy no opportunity to submit or comply.

As for the level of force involved, Torres contends that the knee strikes were minor.  Officers' Mem. 22.  But video evidence suggests that the knee strikes were swift, and vigorous enough to shake Murphy's body.  And although Murphy did not know about the knee strikes until he saw the video, when he went to the hospital hours after the incident, he said that he had rib pain on his right side, which is where he was struck.  Pl.'s SUF Ex. K, at 8.  The Court therefore concludes that Torres's knee strikes amounted to excessive force and, although both strikes were unreasonable, the second knee strike was even less reasonable than the first.

### ii. Qualified Immunity

The knee strikes violated Murphy's constitutional right to be free from excessive force.  But the doctrine of qualified immunity shields Torres from liability unless that right, as applied to the circumstances of this case, was "clearly established at the time

of the violation." Heredia, 125 F.4th at 46 (quoting Raiche, 623 F.3d at 35). For a right to be clearly established, the law must have been sufficiently clear at the time "that every reasonable officer would have understood that what they did was unlawful." Id. at 46-47 (citation modified) (quoting Segrain v. Duffy, 118 F.4th 45, 57 (1st Cir. 2024)); see District of Columbia v. Wesby, 583 U.S. 48, 63 (2018). "Although excessive force is by definition unreasonable force, 'reasonable people sometimes make mistaken judgments, and a reasonable officer sometimes may use unreasonable force." Mlodzinski v. Lewis, 648 F.3d 24, 33 (1st Cir. 2011) (quoting Morelli v. Webster, 552 F.3d 12, 24 (1st Cir. 2009)). "When this occurs, 'qualified immunity gives an officer the benefit of a margin of error.'" Id. (quoting Morelli, 552 F.3d at 24). In other words, "[q]ualified immunity operates to protect officers from the sometimes hazy border between excessive and acceptable force." Id. (citation modified) (quoting Saucier v. Katz, 533 U.S. 194, 205-06 (2011)).

The Court is not convinced that at the time of this incident, every reasonable officer would have known that under these circumstances the knee strikes were unlawful. The law was sufficiently clear for a reasonable officer to have known that it was unlawful to use "significant force" against a suspect who had not been "given a chance to submit peacefully to arrest." Ciolino,

861 at 304.  The law in other circuits also clearly distinguished at the time between active and passive resistance to arrest, with the former permitting a more significant use of force to subdue a suspect.  See, e.g., Rudlaff v. Gillispie, 791 F.3d 638, 642 (6th Cir. 2015) ("When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot."); see also Alicea v. Thomas, 815 F.3d 283, 292 (7th Cir. 2016); Trammel v. Fruge, 868 F.3d 332, 341 (5th Cir. 2017); Coles v. Eagle, 704 F.3d 624, 629-30 (9th Cir. 2012).  But the law also recognized at the time that drawing the line between active and passive resistance can be difficult, even for a court, and that some degree of force could be reasonable under the circumstances even in the case of passive resistance.  See Trammel, 704 F.3d at 341 ("It is unclear at what point passive resistance becomes the sort of active resistance which justifies force."); Bryan v. MacPherson, 630 F.3d 805, 830 (9th Cir. 2010) ("Even purely passive resistance can support the use of some force, . . . depend[ing] on the factual circumstances underlying that resistance.").

Here, Murphy was not given a chance to submit peacefully to arrest, nor was he actively resisting arrest.  But the knee strikes — however vigorous — did not rise to the "significant" level force in Ciolino or Raiche, which both involved takedowns.  Ciolino, 861

28

F.3d at 304 (citing Raiche, 623 F.3d at 39 & n.3).  Furthermore,
in both cases, the First Circuit emphasized that "the defendant
officer [did not have] to make 'split-second judgments' in response
to 'tense, uncertain, and rapidly evolving' circumstances."  Id.
(quoting Raiche, 623 F.3d at 39).  But Torres did in this case.
Finally, even though it was unreasonable for Torres to deliver the
knee strikes without first giving Murphy a chance to comply either
with an order to give up his hands or with less significant force,
the Court finds that a reasonable officer could have made the same
mistaken judgment as Torres under the circumstances.  See
Mlodzinski, 648 F.3d at 33.  In short, Torres confronted a
situation in which there was a "hazy border between excessive and
acceptable force."  Id. (quoting Saucier, 533 U.S. at 205-06).
Therefore, despite the Court's finding that Torres used excessive
force, he is protected from liability under the doctrine of
qualified immunity.

### 2. Municipal Liability (the City)[3]

The Court grants summary judgment for the City on Murphy's
§ 1983 excessive force claim, but only regarding the allegations
against Tavares.  See supra Part III.B (noting Murphy does not

---

[3] Murphy sues Tavares, Torres, Clements, and Paré individually
and in their official capacities.  Am. Compl. ¶¶ 4-8, Dkt. No. 32.
The Court treats all official capacity claims as claims against
the City.

argue that the City is liable for Tavares's conduct).  With respect to the allegations against Torres, the City's Motion is denied.

To succeed on his claim against the City, Murphy must prove that Torres (1) violated his right to be free from excessive force and (2) did so "pursuant to official municipal policy."  Connick v. Thompson, 563 U.S. 51, 60 (2011) (quoting Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)).  A municipality cannot be sued under § 1983 based on a theory of vicarious liability. Id.  "Instead, it is when the execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983."  Monell, 436 U.S. at 694. Notably, municipalities do not enjoy qualified immunity.  Berge v. Sch. Comm. of Gloucester, 107 F.4th 33, 38 n.7 (1st Cir. 2024).

"In limited circumstances," a local government's failure to train, supervise, or discipline its police officers regarding the use of force "may rise to the level of an official government policy for purposes of § 1983."  Connick, 563 U.S. at 61; see DiRico v. City of Quincy, 404 F.3d 464, 468 (1st Cir. 2005).  To prevail on this theory, the plaintiff must show that in failing to train, supervise, or discipline its officers, the local government exhibited "deliberate indifference to the rights of persons with whom the police come into contact."  City of Canton v. Harris, 489 U.S. 378, 388 (1989).  "'[D]eliberate indifference' is a stringent

standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 410 (1997).

The City moves for summary judgment only to the extent that Murphy's claim is based on a failure-to-discipline theory. See Defs.' City, Clements & Paré's Mem. Supp. City's Mot. ("City's Mem.") 24, Dkt. No. 50-1. According to the City, to succeed on a failure-to-discipline theory, Murphy must show that "Torres had 1) known allegations of misconduct that 2) pre-dated this incident, 3) were of a similar kind as is alleged in this case [and] that were 4) shown by [Murphy] to be unconstitutional acts that were 5) not disciplined by the police department." Id. at 7 (first citing Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 93-94 (1st Cir. 1994, and then citing Saldivar v. Racine, 818 F.3d 14, 17-19 (1st Cir. 2016)). In other words, there must have been "serious prior incidents" — similar to the one at issue here — that put the City "on inquiry notice of [Torres's] danger to the public," and the City's failure to discipline Torres for those incidents must have been "the moving force behind the alleged violation." Id. at 10 (internal quotation marks omitted) (quoting Eason v. Alexis, 824 F. Supp. 2d 236, 246 (D. Mass. 2011)).

Torres was the subject of two civilian complaints involving the use of excessive force prior to Murphy's arrest. The first

concerned an arrest on June 28, 2019, in which officers were called to an apartment building where a visibly intoxicated man had stabbed himself with a screwdriver and was rubbing his blood on the walls of a common area and knocking on his neighbors' doors. Id. Ex. B, at 7, Dkt. No. 50-3. According to the incident report, the suspect refused to obey police orders and was taken to the ground, after which he resisted arrest, first by placing his hands under his body and kicking his legs, then by grabbing Torres's forearm and later his duty belt. Id. Torres and other officers delivered multiple closed-fist and knee strikes to the suspect's face and abdomen to get him to comply. Id. The complaint was ultimately withdrawn, and although investigators within the police department determined that the use of force was justified, the officers were advised about other approaches they could have taken to resolve the incident more quickly and effectively, such as using a taser. Id. at 20-21.

The second complaint involved an arrest on February 23, 2020, in which Torres took a suspect to the ground because, according to the incident report, she yanked an officer's whistle from his mouth and flailed her arms while Torres escorted her out of a nightclub. Id. at 41. The incident report also notes a separate arrest, this one not the focus of a complaint, in which Torres ordered a suspect who was on the ground to give up his hands and "delivered multiple

knee strikes" to the suspect's left side until he complied.  Id.
This complaint was also withdrawn.  Id. at 26.

     Standing alone, these complaints are insufficient to hold the
City liable for Torres's use of force against Murphy.  These were
known allegations of misconduct that preceded Murphy's arrest and
did not result in discipline, but only one allegation involved the
use of knee strikes, and even then, the reported facts are readily
distinguishable from Murphy's arrest.  Nor has Murphy proven that
Torres's conduct in the earlier incidents was unconstitutional.
These incidents did not put the City on notice that Torres was
dangerous to the public.  To the extent that Murphy's § 1983 claim
against the City is premised solely on these two complaints, the
City is entitled to summary judgment.

     The problem for the City, however — indeed, as it seems to
acknowledge — is that the complaints against Torres are but two
pieces of a larger puzzle.  See Defs. City, Clements & Paré's Reply
Pl.'s Obj. City's Mot. ("City's Reply") 2 n.2, Dkt. No. 57.  That
puzzle, when put together, reveals what Murphy calls "a widespread
policy of using unreasonable knee and fist strikes against non-
compliant, passively resisting arrestees, typically, while they
are prone, facedown, and surrounded by multiple officers."  Pl.'s
Resp. Opp'n City's Mot. ("Pl.'s Resp. City") 2, Dkt. No. 54.  Among
other pieces of the puzzle: first, Murphy asserts that the Officers

33

testified "that they were trained to use closed fist and knee strikes . . . when the arrestees exhibited passive resistance." Id. at 5.  Second, the City's Rule 30(b)(6) designees testified "that such training was given and that Defendant Torres acted in accordance with that training when he used knee strikes against . . . [Murphy]."  Id.  And third, "investigators and supervisors repeatedly ratified and approved the use of" fist and knee strikes that were the subject of civilian complaints, of which the complaints against Torres, Murphy alleges, are just two examples. Id.  Because Murphy does not move for summary judgment on his § 1983 excessive force claim against the City, the Court need not consider this evidence further.  For now, it is sufficient to find that, because Murphy's theory of municipal liability is not premised solely on the City's alleged failure to discipline its officers generally, much less a failure to discipline Torres specifically, Murphy's claim against the City may proceed.

### 3. Supervisory Liability (Chief Clements)

As discussed above, Murphy does not contend that Clements is liable under § 1983 for the allegations of excessive force against Tavares — only Torres — and he concedes that Paré is not liable on any counts.  See supra Part III.B.  In any event, the Court grants summary judgment to Clements and Paré on all counts.

To succeed on a claim for supervisory liability under § 1983,

34

"the plaintiff must show that one of the supervisor's subordinates abridged the plaintiff's constitutional rights" and, furthermore, that "the supervisor's action or inaction was affirmatively linked to that behavior in the sense that it could be characterized as supervisory encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference."[4] Guadalupe-Baez v. Pesquera, 819 F.3d 509, 514-15 (1st Cir. 2016) (citation modified) (first citing and then quoting Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008)). An "affirmative link," in this context, requires "proof that the supervisor's conduct led inexorably to the constitutional violation." Id. at 515 (quoting Hegarty v. Somerset County, 53 F.3d 1367, 1380 (1st Cir. 1995)). Although that is a difficult standard to meet, a plaintiff could, for example, "prove causation by showing inaction in the face of

---

[4] The case law is unclear whether deliberate indifference is a required showing in all § 1983 supervisory liability claims or only those alleging gross negligence. See Lipsett v. Univ. of P.R., 864 F.2d 881, 902 (1st Cir. 1988) (suggesting through syntax that "deliberate indifference" modifies only "gross negligence" and not "encouragement," "condonation," or "acquiescence"). In any event, Murphy hardly mounts an argument in support of his claim against Clements, and what argument Murphy does make sounds in deliberate indifference. See Pl.'s Resp. Opp'n City's Mot. 2, 18, Dkt. No. 54 (arguing Clements had actual and constructive knowledge of ongoing constitutional violations); Justiniano v. Walker, 986 F.3d 11, 20 (1st Cir. 2021) (stating that deliberate indifference requires a showing of actual or constructive knowledge).

a 'known history of widespread abuse sufficient to alert a supervisor to ongoing violations.'" Id. (quoting Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994)). But "'[i]solated instances of unconstitutional activity' will not suffice." Id. (alteration in original) (quoting Maldonado-Denis, 23 F.3d at 582).

Murphy has not proven an affirmative link between Clements's action or inaction and Torres's use of excessive force. His claim appears to hinge on a contention that, as Chief of Police, Clements knew there was a widespread practice in the police department of using closed-fist and knee strikes against passively resisting arrestees. See Pl.'s Resp. City 18-19. As support, Murphy asserts that the Chief of Police reviews each complaint against the department or its members and that Clements "receiv[ed] numerous civilian complaints about the exact practice at issue by Defendant Torres." Id. at 19; see also Pl.'s SUF Ex. N, at 8, 58, Dkt. No. 46-15. But Murphy raises only the two complaints against Torres discussed above and a third complaint against different officers who used closed-fist strikes against an arrestee who was pinned on the ground. See Pl.'s Resp. City 12-14. It may be that when Murphy refers to "numerous examples . . . of other civilian complaints [involving] the exact conduct at issue here," he does not mean only these three. See id. at 18. Regardless, these

complaints are the only ones he has put before the Court, and they do not come close to showing a "history of widespread abuse sufficient to alert a supervisor to ongoing violations."[5] Guadalupe-Baez, 819 F.3d at 515.  Therefore, the Court finds that Clements, in addition to Paré, is entitled to summary judgment on all counts.

**C. State Excessive Force**

The state constitutional claims that Murphy has not abandoned are for excessive force against both Tavares and Torres.  Because Rhode Island law does not allow private plaintiffs to sue for excessive force in violation of their state constitutional rights, Defendants are entitled to summary judgment on these claims.

The Rhode Island Constitution has a state analogue to the Fourth Amendment of the U.S. Constitution.  R.I. Const. Art. 1 § 6.  But the Rhode Island General Assembly has not enacted a private cause of action for the deprivation of state constitutional rights analogous to § 1983, nor has the Rhode Island Supreme Court read an implied right of action into article 1, section 6 analogous to that created in Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).  See Hagopian v. City of

---

[5] If the "numerous complaints" Murphy alludes to are just the three discussed in his brief, then that could be a problem for his municipal liability claim down the road.

Newport, No. 18-283, 2021 WL 4742701, at *1 n.1 (D.R.I. Oct. 12, 2021).  To be sure, the Rhode Island Supreme Court has not addressed whether article 1, section 6 contains an implied right of action.  But as another judge of this District explained in a recent, well-reasoned decision, the state court's review of other constitutional provisions strongly suggests that the answer is no. See Ricci v. Rhode Island, No. 20-cv-543, 2023 WL 4686025, at *10- 11 (D.R.I. July 21, 2023).  The Court incorporates that reasoning in full; but to summarize: because article 1, section 6 "merely indicate[s] principles, without laying down rules by means of which those principles may be given force of law," it is not "self- executing."  See Doe v. Brown Univ., 253 A.3d 389, 399 (R.I. 2021) (quoting Bandoni v. State, 715 A.2d 580, 586 (R.I. 1998)).  And because article 1, section 6 is not self-executing, it "does not give rise to a private cause of action."  Id. at 401.

Murphy argues that if he cannot sue for excessive force under article 1, section 6, then he can do so under article 1, section 2, specifically the due process clause. Pl.'s Mem. 24-25.  First, Murphy cites Jones v. Rhode Island, 724 F. Supp. 25 (D.R.I. 1989), in which a judge of this Court found that the state constitution's due process clause contains a private right of action.  Jones, 724 F. Supp. at 35.  Next, Murphy asserts that the state constitution's due process clause was intended to parallel that of the Fourteenth

Amendment, which incorporates most Bill of Rights protections against the states.  Pl.'s Mem. 24.  Therefore, he argues, it should be read to protect substantive rights analogous to those enshrined in the Bill of Rights, such as the right against unreasonable seizures under article 1, section 6.  Id.  Putting all this together, Murphy argues that because there is an implied right of action under the state constitution's due process clause, and because that clause incorporates the protections of article 1, section 6, he can bring a claim for excessive force under the state constitution.

This argument is unavailing.  First, as a matter of structural constitutional law, applying the logic of incorporation under the due process clause of the Fourteenth Amendment to that of a state analogue makes little sense.  The Supreme Court has found that incorporation under the Fourteenth Amendment is necessary because otherwise the Bill of Rights would not bind the states.  See Mapp v. Ohio, 367 U.S. 643, 650-51, 655 (1961) (discussing incorporation of Fourth Amendment).  But Rhode Island is already bound by the substantive-rights provisions of its own constitution.  Second, this Court's decision in Jones conflicts with subsequent decisions of the Rhode Island Supreme Court, namely Doe v. Brown University, 253 A.3d 389 (R.I. 2021).  In Doe, the state court held that the Rhode Island Constitution's antidiscrimination clause, which

appears alongside the due process clause in article 1, section 2, does not contain a private right of action. <u>Doe</u>, 253 A.3d at 401. Importantly, the court's analysis was not cabined to the antidiscrimination clause; instead, the court analyzed article 1, section 2 as a whole. <u>See id.</u> at 398-401. Therefore, while <u>Doe</u>'s holding does not specifically resolve whether the due process clause contains a right of action, its reasoning appears dispositive on that question, thus leaving <u>Jones</u> unmoored. The Court therefore grants summary judgment for Defendants on all of Murphy's state constitutional claims.

### D. Common-Law Claims

All Defendants move for summary judgment on Murphy's claims for common-law assault and battery. Officers' Mem. 19-23; City's Mem. 3. Murphy, however, moves for summary judgment on his claims for assault and battery only as against Tavares and Torres. Pl.'s Mem. 26. On Murphy's assault claims, the Court grants summary judgment for all Defendants. On Murphy's battery claims: as against Tavares, the Court finds that Murphy is entitled to summary judgment pending a jury's determination of the baton issue and damages; as against the City and Clements for Tavares's conduct, the Court grants summary judgment for the City and Clements; as against Torres, the Court grants summary judgment for Torres; and as against the City and Clements for Torres's conduct, the Court

denies summary judgment for the City and grants summary judgment for Clements.[6]

### 1. Assault

Murphy argues that Tavares and Torres are liable for assault because their conduct put Murphy "in reasonable fear of imminent bodily harm."  Pl.'s Mem. 22 (quoting Broadley v. State, 939 A.2d 1016, 1021 (R.I. 2008)).  That is, after Tavares allegedly struck Murphy, Murphy feared another strike.  See id.  (Murphy does not explain how this theory applies to Torres.)  "Nothing in the case law," he says, "prevents a person from being put in reasonable fear of another battery after one has already been committed." Id.

The Court finds that Murphy cannot make out a claim of assault against either Tavares or Torres.  "In Rhode Island, 'an assault is a physical act of a threatening nature or an offer of corporal injury which puts an individual in reasonable fear of imminent bodily harm.'"  Doe v. Brown Univ., 304 F. Supp. 3d 252, 264 (D.R.I. 2018) (citation modified) (quoting Hennessey v. Pyne, 694 A.2d 691, 696 (R.I. 1997)).  An assault may precede a battery, such as when a defendant throws a rock at a plaintiff, causing the plaintiff to fear imminent bodily harm (assault), and the rock

---

[6] As stated above, Murphy concedes that Paré is not liable on any counts.  Pl.'s Resp. Opp'n City's Mot. 2, Dkt. No. 54.

41

hits the plaintiff (battery).  See, e.g., Picard v. Barry Pontiac-Buick, Inc., 654 A.2d 690, 694 (R.I. 1995) (involving an assault and battery).  A battery may also precede an assault.  For example, after the rock hits the plaintiff (battery), the defendant throws a second rock, and the plaintiff sees it coming (assault).  But even though assault and battery "usually aris[e] from the same transaction," they are "separate acts, . . . each having independent significance."  Id.

Murphy argues that Tavares's use of force against him, which amounted to a battery, caused him to fear additional bodily harm, thus giving rise to assault.  Pl.'s Mem. 22.  In effect, he contends that the battery and assault did not merely arise from the same transaction but were indeed the same act: the battery caused Murphy to fear another battery, and therefore, the battery was an assault.  This theory conflicts with Rhode Island law on the relationship between assault and battery because it blurs the line between two discrete torts.[7]  An assault and battery may be closely linked, but the law requires them to be "separate acts."  Picard, 654 A.2d at 694.  Therefore, Tavares's takedown was not both a battery and an assault.

As for Murphy's assault claims arising from Torres's conduct,

---

[7] Murphy does not contend that Tavares is liable for assault for his actions preceding the takedown.

he does not pinpoint a specific act that put him in fear of imminent bodily harm other than the takedown, which was executed by Tavares, not Torres.  Pl.'s Mem. 22.  For the reasons above, this theory of assault liability cannot succeed, and it fails for the added reason that responsibility for causing Murphy to fear additional bodily harm cannot be imputed from Tavares to Torres.  Accordingly, the Court grants summary judgment for all Defendants on Murphy's claims for common-law assault.

### 2. Battery

"Where a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault and battery, [the court's] determination of the reasonableness of the force used under § 1983 controls [its] determination of the reasonableness of the force used under the common law assault and battery claims." Raiche, 623 F.3d at 40.  "Additionally, Rhode Island 'recognizes a qualified immunity defense under state law analogous to the federal doctrine established by the United States Supreme Court.'" Segrain, 118 F.4th at 70 (1st Cir. 2014) (citation modified) (quoting Hatch v. Town of Middletown, 311 F.3d 83, 90 (1st Cir. 2002)).

The Court has already determined that Tavares used excessive force and is not entitled to qualified immunity.  See supra Part III.B.1.a.  Consistent with these findings, it follows that Tavares

committed battery as well; but the Court reserves final judgment on Murphy's battery claim against Tavares pending a jury's determination of whether Tavares's baton struck Murphy's head. The Court grants both the City and Clements summary judgment on Murphy's battery claim against Tavares because Murphy does not contend that either is liable for Tavares's conduct.

Regarding Torres, the Court finds that just as the doctrine of qualified immunity shields him from liability for excessive force under § 1983, so too does it shield him from liability for battery. See supra Part III.B.1.b.ii. Torres is thus entitled to summary judgment on Murphy's battery claim. Murphy also contends that the City and Clements are liable for Torres's conduct, though he does not move for summary judgment on these issues. The City and Clements, however, do move for summary judgment. City's Mem. 24-26. For the reasons discussed supra Part III.B.2, the Court finds that the City is not entitled to summary judgment on Murphy's battery claim against Torres and, therefore, his claim may proceed to trial as against the City. See Cruz v. Town of North Providence, 833 A.2d 1237, 1240 (R.I. 2003) (per curiam) (requiring plaintiff to show officer's "conduct was consistent with a municipal policy or practice" to hold city liable for officer's intentional tort). As for Murphy's supervisory liability claim for Torres's conduct, the Court grants summary judgment to Clements. Although Rhode

Island applies the § 1983 standard for municipal liability to intentional torts, it is unclear whether the § 1983 standard for supervisory liability also governs.  Murphy suggests that it does.  See Pl.'s Resp. City 18-19 (quoting Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989)).  Applying that standard, the Court finds that Clements is not liable for battery arising from Torres's conduct, just as he is not liable for excessive force.  Clements is therefore entitled to summary judgment on this claim.

* * *

To summarize the issues:

- The Court grants summary judgment to all Defendants on Counts Three, Four, Five, Six, and Nine;

- Regarding Murphy's claims under § 1983 for excessive force, the Court —

  o finds that Tavares used excessive force and is not entitled to qualified immunity, but it reserves judgment pending a jury's determination of whether Tavares struck Murphy in the head with his baton and what damages are owed;

  o finds that although Torres used excessive force, he is entitled to qualified immunity; thus, he is not liable under § 1983 and the Court grants him summary judgment on this claim;

  o finds that the City is not liable under § 1983 for the actions of Tavares and therefore grants summary judgment to the City in this respect; but the City is not entitled to summary judgment regarding its liability under § 1983 for the actions of Torres, and the Court thus denies the City's motion for summary judgment in that respect;

  o finds that Clements is not liable under § 1983 for the

45

actions of either Tavares or Torres, and thus grants him summary judgment on these claims;

  o grants summary judgment to Paré;

- The Court grants summary judgment to all Defendants on Murphy's claims for excessive force under the state constitution;

- The Court grants summary judgment to all Defendants on Murphy's claims for assault;

- Regarding Murphy's claims for battery, the Court —

  o finds that Tavares committed battery and is not entitled to qualified immunity, but it reserves judgment pending a jury's determination of whether Tavares struck Murphy in the head with his baton and what damages are owed;

  o finds that Torres is entitled to qualified immunity and thus he is not liable for battery; the Court grants him summary judgment on this claim;

  o finds that the City is not liable for battery stemming from the actions of Tavares and therefore grants summary judgment to the City in this respect; but the City is not entitled to summary judgment regarding its liability for battery stemming from the actions of Torres, and the Court thus denies the City's motion for summary judgment in that respect;

  o finds that Clements is not liable for battery stemming from the actions of either Tavares or Torres, and thus grants him summary judgment on these claims;

  o grants summary judgment to Paré.

- At trial, the jury's determination as to Murphy's claims against Tavares will be limited to (1) whether Tavares's baton struck Murphy's head and (2) damages; final judgment will enter once the jury makes these determinations.

- All remaining issues for which judgment has not entered will proceed to trial.

46

## IV.  CONCLUSION

For the reasons above, Defendants Tavares and Torres' Motion for Summary Judgment, Dkt. No. 42, is GRANTED IN PART and DENIED IN PART; Plaintiff's Motion for Partial Summary Judgment and Objection to the Officers' Motion, Dkt. No. 45, is DENIED IN PART; and Defendants' City of Providence, Hugh T. Clements, and Steven M. Paré's Motion for Partial Summary Judgment, Dkt. 50, is GRANTED IN PART and DENIED IN PART.

As to the remaining parts of Plaintiff's Motion for Partial Summary Judgment and Objection to the Officers' Motion, Dkt. No. 45, Plaintiff is entitled to summary judgment pending a jury's determination of (1) whether the baton struck him in the head and (2) damages.

IT IS SO ORDERED.

_____
William E. Smith
Senior District Judge
Date: January 12, 2026